**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DURHAM COMMERCIAL CAPITAL CORP.,

          Plaintiff,

v.                                   Case No. 3:14-cv-877-J-34PDB

SELECT PORTFOLIO SERVICING, INC.,

          Defendant.

_____/

## O R D E R

**THIS CAUSE** is before the Court on (1) Defendant Select Portfolio Servicing, Inc.'s Motion for Final Summary Judgment (Doc. 58; "SPS's Motion"), filed on October 28, 2015; and (2) Plaintiff, Durham Commercial Capital Corp.'s Motion (Renewed) for Final Summary Judgment Against Defendant Select Portfolio Servicing, Inc. and Incorporated Memorandum of Law (Doc. 64; "Durham's Motion"), filed on November 2, 2015. On November 17, 2015, Defendant, Select Portfolio Servicing, Inc., ("SPS") filed Defendant Select Portfolio Servicing, Inc.'s Response to the Renewed Motion for Final Summary Judgment of Durham Commercial Capital Corporation (Doc. 70; "SPS's Response"). Plaintiff, Durham Commercial Capital Corp. ("Durham") filed Plaintiff, Durham Commercial Capital Corp.'s Response in Opposition to Defendant Select Portfolio Servicing, Inc.'s Motion for Final Summary Judgment and Incorporated Memorandum of Law (Doc. 71; "Durham's Response") on November 23, 2015.

At the Court's request, on July 29, 2016, the parties filed supplemental briefing addressing which state's law should apply to the various issues presented in the parties' Motions. See Defendant Select Portfolio Servicing, Inc.'s Memorandum on Choice of Law

-1-

Issues (Doc. 109; SPS's Choice of Law Memo.); Plaintiff Durham Commercial Capital Corp.'s Brief Concerning Choice-of-Law Issues (Doc. 110; Durham's Choice of Law Memo.). Having reviewed the parties' submissions, the Court determines that this matter is ripe for review.[1]

## I.   Background Facts[2]

SPS is a national mortgage foreclosure servicer. Deposition of Chief Financial Officer Peter Justin Crowley as corporate representative of SPS, dated Mar. 2, 2015 (Docs. 25-2–25-3; "Crowley Depo.") at 24–25.[3] Beginning in at least 2008, SPS used the law firm Connolly, Geaney, Ablitt & Willard, P.C., or its predecessor[4] ("CGAW") as outside counsel to initiate foreclosure proceedings in state courts and bankruptcy courts. Id. at

---

[1] The Court recognizes that Durham asks the Court to allow both parties to amend their briefing on summary judgment "to correct for the choice-of-law issues [the parties identified] and to provide the Court with the correct case and statutory law." Durham's Choice of Law Memo. at 20. SPS apparently contemplated the same course of action. See Defendant Select Portfolio Servicing, Inc.'s Response in Opposition to Plaintiff's Motion for Status Conference (Doc. 116) at 2–3. However, upon review of the parties' memoranda on choice of law and having determined the law applicable to each issue as described in this Order, the Court finds additional briefing on summary judgment unnecessary. For the most part, the parties are in agreement on the applicable law, and the Court's determinations as to the applicable law do not result in materially different standards.

Likewise, the Court recognizes that Durham requests "a brief telephonic status conference with the Court in order to attain the current status of this matter and whether this action may proceed to trial." Plaintiff Durham Commercial Capital Corp.'s Motion for Status Conference (Doc. 115). SPS opposes Durham's request, asserting that the status of the case is already clear. See Defendant Select Portfolio Servicing, Inc.'s Response in Opposition to Plaintiff's Motion for Status Conference (Doc. 116). Because the Court addresses the parties' motions for summary judgment in this Order and will enter an amended case management and scheduling order establishing new deadlines and event dates, Durham's motion for a status conference is due to be denied as moot.

[2] Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either party's motion, view the facts presented in the light most favorable to the party opposing summary judgment. The Court will so note its perspective when appropriate. The facts recited in this section are either undisputed, or any disagreement has been indicated. See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp.2d 1337, 1340 (M.D. Fla. 2008). The Court notes that these facts may differ from those ultimately proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[3] All citations to depositions and other documents refer to the pagination as printed on the documents themselves, rather than the page numbers supplied by the Court's electronic filing system, unless otherwise stated.

[4] CGAW's predecessor was Ablitt Scofield, P.C., which was formerly known as Ablitt Law Offices, P.C. Deposition of Lawrence Scofield dated July 23, 2015 (Doc. 84; "Scofield Depo.") at 6–7.

85. SPS executed its most recent agreement with CGAW on January 1, 2013, and the parties amended that agreement on January 22, 2014. Id. at 84–86; see also Attorney Agreement between Select Portfolio Servicing, Inc., and Ablitt Scofield, PC (fka Ablitt Law Offices, PC) (Doc. 64-7, beginning at p. 2; the "Attorney Agreement") (unredacted version filed under seal).

Under the Attorney Agreement, CGAW agreed to "provide to SPS various legal services that may include matters related to mortgage foreclosures and bankruptcies, as well as other loan default services in Florida, Massachusetts, New Hampshire, and Puerto Rico." Attorney Agreement at 1. The Attorney Agreement included provisions requiring CGAW's compliance with all applicable laws and preservation of the privacy of information related to SPS's business. Id. at 3. Also, through the Attorney Agreement, both parties acknowledged their confidentiality obligations. Id. at 10–13. The Attorney Agreement required CGAW to "notify SPS within ten (10) days of any material adverse change to [CGAW's] business, insurance coverage[,] and/or financial condition." Id. at 7. CGAW also agreed to "indemnify and hold harmless SPS and its clients from and against any … injury … caused by negligence or wrongful conduct of" CGAW, but the Agreement provided that CGAW would "have no liability or obligation to indemnify to the extent the act giving rise to the indemnification arose out of information provided by SPS … or in connection with the negligence or wrongful conduct of SPS." Id. at 15.

The Attorney Agreement provided that CGAW would submit invoices through third party Lender Processing Services ("LPS"), which would review invoices for thoroughness and completeness and would decide whether to accept or reject submitted invoices. Id. at 4, 9–10; Deposition of Robert Feige dated July 24, 2015 (Doc. 86; "Feige Depo.") at

64–66. After LPS approved an invoice, SPS would receive the invoice for final approval and payment. Feige Depo. at 64–66. SPS could notify CGAW of any billing disputes either through LPS's system or directly in writing. Attorney Agreement at 10.

Durham and CGAW entered into a factoring agreement on November 7, 2012. See Nonrecourse Receivables Purchase Contract and Security Agreement (Doc. 64-5, beginning at p. 16; the "Factoring Agreement"). Under the Factoring Agreement, Durham agreed to purchase CGAW's accounts receivable. Id. at 1. The Factoring Agreement defined "Account" as "both present and future accounts, contract rights[,] and other forms of obligations for the payment of money arising out of the sale by Client of goods or the performance by Client of services." Id. CGAW also granted Durham a security interest in all of CGAW's Accounts "as collateral for the repayment of any and all obligations and liabilities whatsoever" of CGAW to Durham. Id. at 3.

Under the Factoring Agreement, CGAW agreed to allow Durham to "use any of [CGAW's] personnel, equipment, including computer equipment, programs, printer output, and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Durham, in its sole discretion, deems appropriate." Id. CGAW also "irrevocably authorize[d] all accountants and third parties to disclose and deliver to Durham … all financial information books and records, work papers, management reports, and other information in their possession relating to" CGAW. Id. The Factoring Agreement provided that Durham or any person it designated would "have the right … to inspect, audit, check, and make copies or extracts from [CGAW's] books, records, journals, orders, receipts, and other correspondence or other

data relating to [CGAW's] business and any other transaction between" Durham and CGAW. Id.

To facilitate financing under the Factoring Agreement, CGAW provided copies of invoices to Durham, which Durham's President, Craig McGrain, averred Durham "reviewed solely in order to ascertain the dollar amounts owing to CGAW by clients and the date payment was due." See Declaration of Craig McGrain dated Nov. 2, 2015, (Doc. 64-5, beginning at p.2; "McGrain Decl.") at 4. McGrain also averred that Durham "never sought from CGAW any documents or information describing the professional legal services provided to CGAW's clients." Id.

On December 21, 2012, Durham sent SPS a notice informing SPS that "the accounts receivable of [CGAW] have been assigned to Durham and are processed through Durham. Therefore payments for invoices should be made payable to and mailed directly to" Durham. See Notice of Assignment (Doc. 64-5 at 31). The Notice of Assignment requested SPS to acknowledge receipt of the notice and informed SPS that "[p]ayment to any other party or address will not constitute payment." Id. It stated that the notice would "remain in full force and effect until you are notified to the contrary in a writing signed by" Durham. Id.

On December 28, 2012, CGAW's then-Chief Financial Officer, Robert Feige, e-mailed John Shelley, an employee of SPS, requesting a signature from SPS acknowledging the Factoring Agreement. See E-mail from Bob Feige to John Shelley dated Dec. 28, 2012 (Doc. 64-10 at 16). Diane Mitchell, SPS's Senior Vice President of Legal Administration, responded stating that she and Jason Miller, SPS's General Counsel "would like a call to discuss this request." E-mail from Diane Mitchell to Bob Feige

dated Dec. 28, 2012 (Doc. 64-10 at 21). Feige responded that he was unavailable for a call, but he explained the background of the transaction and the urgency of prompt approval, and stated that the agreement would "improve[ ] the viability of the law firm." E-mail from Bob Feige to Diane Mitchell dated Dec. 28, 2012 (Doc. 64-10 at 14–15). Mitchell forwarded Feige's e-mail to Miller and two others on December 31, 2012, stating that CGAW had been "struggling financially for some time—at least back to 2010." E-mail from Diane Mitchell to Jeff Graham and Randhir Gandhi dated Dec. 31, 2012 (Doc. 64-10 at 14). Internally, Miller expressed to Crowley "concerns about what the … agreement between [CGAW] and Durham might mean for the firm, and whether we should execute and agree and accept the agreement." Crowley Depo. at 38. Feige followed up with Shelley on January 8, 2013, stating that he needed the signature so CGAW could close its "new line of credit facility." E-mail from Bob Feige to John Shelley dated Jan. 8, 2013 (Doc. 64-10 at 5). Mitchell forwarded the e-mail to Miller, who stated, "I'm okay with our guys signing it." E-mail from Jason Miller to Diane Mitchell dated Jan. 8, 2013 (Doc. 64-10 at 5) Mitchell signed the Notice of Assignment that day. See Notice of Assignment.

As early as 2010, CGAW experienced financial difficulties which led it to at times misuse client trust funds to cover its operating expenses. Feige Depo. at 8–9. The firm nearly corrected the deficiency in 2013 but resumed the misuse of trust funds later that year. Id. at 9–10. CGAW's shareholders discovered that client trust funds were short millions of dollars in August 2013. Deposition of John Connolly, Jr., dated July 20, 2015 (Doc. 85; "Connolly Depo.") at 39. The shareholders decided not to tell the firm's clients for fear that releasing that information would cause the firm to collapse. Id. at 47, 52;

Deposition of Lawrence Scofield, dated July 23, 2015 (Doc. 84; "Scofield Depo.") at 13–14.

At some point in November 2013, Steven Ablitt of CGAW requested that SPS begin sending all wire-transfer payments on invoices to an account Ablitt controlled. Crowley Depo. at 54–56. Before that request, in October 2013, Ablitt had agreed to convert his stock into non-voting stock and relinquish management control to other shareholders. Connolly Depo. at 10–14. Connolly testified that although he and others became directors of CGAW, "[i]t was nominal" because Ablitt "ran the place." Id. at 14. Ablitt did not receive compensation for relinquishing his voting rights because he "would have been allowed to come back or his stock would have converted back to voting stock" if certain conditions had occurred. Id.

From December 2013 through June 2014, SPS sent about 12 wire payments totaling about $1,200,000 to CGAW in accordance with Ablitt's instructions. Crowley Depo. at 32, 56–57. During that time frame, SPS continued to regularly send payments to Durham via check. McGrain Decl. at 13. Connolly and fellow CGAW shareholder Lawrence Scofield both testified that they were not aware that SPS had been making payments directly to CGAW rather than to Durham. Connolly Depo. at 185–86; Scofield Depo. at 33–34. Prior to Ablitt's instructions, between January and November 2013, SPS had sent all payments on invoices, by both wire and check, to Durham. McGrain Decl. at 5. Durham did not notify SPS that Ablitt had authority to speak or act on Durham's behalf, and Durham never formally released SPS from the Notice of Assignment. Crowley Depo. at 58–60.

In February 2014, Durham learned that CGAW had received a wire payment from SPS. Deposition of Craig McGrain dated June 19, 2015 (Doc. 82; "McGrain Depo.") at 42, 48–50, 62–63. Feige explained to one of Durham's employees that the payment "went into an escrow account." Id. at 48–49. McGrain asked Feige about the payment, and Feige said he had clarified with Ablitt that the payment to the escrow account represented trust funds that "had nothing to do with payments." Id. at 50, 62–63; McGrain Decl. at 7. Based on that explanation, McGrain was satisfied that the payment was not within the scope of the Factoring Agreement. McGrain Depo. at 42; McGrain Decl. at 7.

CGAW's financial condition continued to decline in early 2014. It began to bounce checks to vendors in February 2014, and United Parcel Service suspended CGAW's account in March following several months of nonpayment. Deposition of Domenic Cedrone dated July 21, 2015 (Doc. 89; "Cedrone Depo.") at 26–28. Between February and April 2014, CGAW was unable to submit invoices because it could not afford the processing fees. Id. at 39–40.

On February 28, 2014, Durham discovered that CGAW had committed "events of default under the Factoring Agreement," which led Durham to "pursue its rights as a secured creditor." McGrain Decl. at 7. However, Durham and CGAW also explored other options. In early March, CGAW and Durham began negotiating a "standstill agreement" which would amend the Factoring Agreement. McGrain Depo. at 78–80. CGAW proposed an "allonge" to the Factoring Agreement, and, after several rounds of editing Connolly and McGrain signed a final version setting forth several provisions modifying the Factoring Agreement. Id. at 88–97, 99; Allonge (Doc. 64-6, beginning at p. 11). The Allonge provided:

> Durham agrees to modify the [Factoring] Agreement in accordance with the terms set forth below. This Agreement to modify will be in effect until March 21, 2014, at which time it will become null and void unless CGAW receives an initial capital infusion in the amount of approximately $728,000.00 with a second infusion in the amount of approximately $250,000.00, on or before March 29, 2014 ("Capital") and provides evidence thereof to Durham.

Allonge at 1.

Under the Allonge, Durham agreed to keep sums that otherwise would be due to CGAW under the Factoring Agreement to the extent CGAW's clients paid those sums on accounts receivable that Durham had already factored. Id. CGAW agreed to replace accounts remaining unpaid for more than 91 days ("Old Accounts") with new accounts ("Replacement Invoices") of equal total value, and CGAW would be entitled to retain any amounts collected on Old Accounts thereafter. Id. The Allonge further provided:

> All new billing for CGAW, commencing after March 6, 2014[,] will go directly to the clients of CGAW and will not be factored by Durham. CGAW will be free to retain, deposit[,] and use any payments it receives of any invoices issued after the effective date of this Allonge which are not Replacement Invoices. However, notwithstanding the foregoing, [Replacement Invoices] shall not go directly to CGAW's clients but shall go to Durham, shall not be factored by Durham, and CGAW shall not be entitled to retain payments [it] may receive relative to the Replacement Invoices until and/or unless Durham has been paid in full as hereinafter described.

Id. To the extent Durham received payments on invoices issued after March 6, 2014, which were not designated as Replacement Invoices, the Allonge provided that "Durham shall have no claim or right to any such payments, and Durham will forward any and all such payments to CGAW forthwith without set off, hold back[,] or claim gainst such funds."

Id. at 2. Under the Allonge, CGAW was to periodically revise its list of accounts to reflect exchanges of Old Accounts and Replacement Invoices. Id. After Durham received $3.2 million in satisfaction of the obligations CGAW owed, "any and all additional funds received by Durham [would] be immediately forwarded to CGAW, and Durham [would]

notify all clients of CGAW to send all future payments directly to CGAW." Id. The parties agreed that, upon such payment, they would "release each other from further claims, liability, or causes of action." Id.

McGrain signed the Allonge and dated it March 20, 2014. Id. at 3. Under the signatures, the original effective date of March 6, 2014, was scratched out and altered to reflect a new effective date of March 20, 2014. Id. Durham never received evidence to its satisfaction of the cash infusions referenced in the Allonge. McGrain Depo. at 125–26. CGAW's shareholders acknowledged that they never saw documentary proof of any cash infusions. Connolly Depo. at 164; Scofield Depo. at 50–51; Deposition of Rachelle Willard dated July 22, 2015 (Doc. 87; "Willard Depo.") at 50–51; Deposition of Kevin Geaney dated July 22, 2015 (Doc. 88; "Geaney Depo.") at 35–37.

On May 8, 2014, Durham hired Brian Mosher to oversee collection of various client accounts. Deposition of Brian Mosher dated June 18, 2015 (Doc. 83; "Mosher Depo.") at 11–12. At McGrain's request, at some point later that month Mosher began working on-site at the CGAW's office in Massachusetts to observe the firm's operations. Id. at 14, 18–20. In June 2014, Mosher was added as a signatory to CGAW's operating accounts and, at McGrain's request, received access to the online account. Id. at 91–95. He also received an e-mail address through CGAW. McGrain Decl. at 11. Although he could not recall whether he used his authority to write checks on the firm's operating account, see Mosher Depo. at 46, other employees testified that he signed hundreds of checks, including for payroll, see Cedrone Depo. at 38–39, 52, 54–55, and approved other attorney reimbursement requests, Scofield Depo. at 47. Mosher at times contacted CGAW's clients to follow up on past-due invoices. Mosher Depo. at 48. He also had

access to CGAW's LPS system. Id. at 66–67. In July 2014, at McGrain's direction, Mosher took possession of one of CGAW's servers, which was being held at CGAW's IT contractor's residence, and brought it to New York. Id. at 90–91, 99; McGrain Depo. at 30–32.

On July 1, 2014, Durham became aware of an e-mail from Ablitt to SPS indicating that SPS had been sending wire payments to CGAW. McGrain Decl. at 5. That day, McGrain e-mailed Ablitt and Connolly informing them of the discovery and stating that Ablitt's instruction "constitutes both a breach of our factoring agreement and criminal theft of Durham's property. We will not transact business with anyone who acts in this manner." E-mail from Craig McGrain to Steven Ablitt and John Connolly dated July 1, 2014 (Doc. 64-6 at 6). On July 3, 2014, Durham's counsel sent a letter to SPS demanding that SPS "pay Durham all monies to which it is entitled" by July 9, 2014. See Letter from the Law Offices of Ullman & Ullman, P.A., Re: Durham Commercial Capital Corp. v. Connolly, Geaney, Ablitt & Willard, P.C. (In Re: Select Portfolio Servicing, Inc.), dated July 3, 2014 (Doc. 64-6 at 2–4). On July 5, 2014, after receiving the letter, Miller sent an e-mail instructing an employee of SPS not to send any funds to CGAW or Durham. E-mail from Jason Miller to Ashley Clark and Dustin Stephenson dated July 5, 2014 (Doc. 64-10 at 61). CGAW ceased operations in early July 2014. Connolly Depo. at 185.

## II.    Procedural History

Durham filed its Complaint (Doc. 1) against SPS on July 25, 2014. In the Complaint, Durham brings a claim against SPS alleging breach of SPS's duty under section 9-406 of the Uniform Commercial Code to pay accounts to Durham as assignee

of CGAW's accounts receivable.[5] Complaint ¶¶ 21–33.

SPS filed Defendant Select Portfolio Servicing, Inc.'s Answer and Affirmative Defenses (Doc. 14; "Answer") on October 27, 2014. In its Answer, SPS asserts 15 affirmative defenses. In its First Affirmative Defense, it asserts that the Factoring Agreement was void as against public policy because it required CGAW to violate ethical obligations. Id. at 5. In its Second Affirmative Defense, SPS argues that, by virtue of Durham's "domination and control" over CGAW at the time SPS made the payments at issue, any instruction from CGAW to cease payment to Durham amounted to an instruction from Durham directly and thus notice to SPS of the termination of the Factoring Agreement. Id. at 5–6. In its Third Affirmative Defense, SPS contends that, for the same reason, Durham's actions constituted waiver of its rights under the Factoring Agreement with respect to SPS. Id. at 6. In its Fourth Affirmative Defense, SPS argues that, by virtue of Durham's domination and control over CGAW and its knowledge of the payments to CGAW, Durham is estopped from arguing the payments were misdirected. Id. In its Fifth Affirmative Defense, SPS asserts that, by virtue of Durham's domination and control over CGAW, Durham has recovered from CGAW any allegedly improper payments, so it is not entitled to a double recovery. Id. In its Sixth Affirmative Defense, SPS contends that any payments made after March 6, 2014, were not subject to the Factoring Agreement in light of the Allonge. Id. at 7. In its Seventh Affirmative Defense, SPS argues that Durham is not entitled to any payment in light of CGAW's prior material breaches of the Attorney Agreement. Id. In its Eighth Affirmative Defense, SPS asserts that it "is entitled to recover

---

[5] Durham's claim against SPS is in Count II of the Complaint. In Count I, Durham brought a claim against CGAW for breach of the Factoring Agreement. Complaint ¶¶ 12–20. Plaintiff later filed a notice of voluntary dismissal without prejudice of its claim against CGAW based on an involuntary bankruptcy petition filed against CGAW. Doc. 12.

consequential damages and to seek repayment of the sums previously paid to Durham or" CGAW, so it is entitled to a setoff or recoupment which would reduce or eliminate Durham's claims. Id. at 8. In its Ninth Affirmative Defense, SPS contends that its right to indemnification under the Attorney Agreement based on CGAW's breach of that agreement provides it with an additional setoff or recoupment right against Durham. Id. at 8–9. In its Tenth Affirmative Defense, SPS argues that Durham is not entitled to any payments to the extent they were for services provided by firms other than CGAW. Id. at 9. In its Eleventh Affirmative Defense, SPS asserts that the Attorney Agreement is unenforceable because CGAW fraudulently induced SPS to enter into the agreement. Id. at 9–10. In its Twelfth Affirmative Defense, SPS contends that CGAW's fraudulent misrepresentations about its financial condition provide SPS with a claim for damages against CGAW which SPS can use to offset Durham's claim. Id. at 10. In its Thirteenth Affirmative Defense, SPS argues that Durham failed to mitigate its damages by failing to prevent SPS from paying CGAW after Durham learned of the payments. Id. In its Fourteenth Affirmative Defense, SPS asserts that Durham has no entitlement to CGAW's accounts receivable to the extent Durham's alleged interest is subordinate to the interests of other secured creditors. Id. at 11. Finally, in its Fifteenth Affirmative Defense, SPS contends that Durham's claims are barred by laches and unclean hands. Id.

## III.   Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[6] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the

---

[6] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

suit under the governing law will properly preclude the entry of summary judgment."

Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## IV.   Discussion

### A.   Applicable Law

Article 9 of the Uniform Commercial Code ("UCC"), as adopted by the State of New York,[7] governs secured transactions. N.Y. U.C.C. §§ 9-101–9-710. Part 4 of Article 9 addresses the rights of third parties. Id. §§ 9-401–9-409. Section 9-102 defines "account" as:

---

[7] At the Court's request, the parties submitted briefing on choice-of-law issues in this case. Durham and SPS agree that New York law applies to Durham's claim based on the UCC, SPS's defenses based on or requiring consideration of the UCC, and any issue requiring interpretation of the Factoring Agreement. See Durham's Choice of Law Memo. at 8, 12–13; SPS's Choice of Law Memo. at 4–9. The Court also agrees that it must apply New York law to these issues. "A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state. Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to that particular type of issue." Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 485 F.3d 1233, 1240 (11th Cir. 2007). Because Durham seeks to vindicate a right to payment allegedly arising from the Factoring Agreement (albeit under the guise of a statutory duty), its claim against SPS most closely sounds in contract. "Generally, Florida enforces choice-of-law provisions unless the law of the chosen forum contravenes strong public policy." Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000). Moreover, under the UCC as codified in Florida, "when a transaction bears a reasonable relation to [Florida] and also to another state or nation, the parties may agree that the law of either [Florida] or of such other state or nation will govern their rights and duties." Fla. Stat. § 671.105(1). Here, because the Factoring Agreement bears a reasonable relationship to New York and specifies that New York law governs, see Factoring Agreement at 7, the Court will apply New York law to all issues relating to the UCC or the Factoring Agreement.

> a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance … .

Id. § 9-102(a)(2). The term includes "health-care-insurance receivables" but expressly does not include

> (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

Id. Under section 9-404(a),

> [u]nless an account debtor has made an enforceable agreement not to assert defenses or claims, … the rights of an assignee are subject to:
>
> > (1) all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and
> >
> > (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

Section 9-406(a) provides that an account debtor "may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor."

-16-

**B.    SPS's Motion**

SPS seeks full or partial summary judgment on four grounds. First, it argues that it is entitled to summary judgment because the Factoring Agreement is void as against public policy. SPS's Motion at 11–18. It contends that the Factoring Agreement required CGAW to disclose attorney-client privileged or otherwise confidential client information and interfered with the firm's ability to exercise independent judgment, in violation of Florida public policy as embodied in the Florida Bar's Rules of Professional Conduct. Id. Second, SPS asserts it is entitled to full, or at least partial, summary judgment because, at the time SPS made all of the payments at issue to CGAW, CGAW had materially breached the Attorney Agreement by (1) disclosing confidential information and (2) failing to notify SPS of any material adverse impacts on CGAW's financial stability. Id. at 19–20. SPS argues that it did not waive its right to assert that CGAW breached the Attorney Agreement by paying on the invoices because, at the time it made payments, it was unaware of CGAW's alleged breaches. Id. at 18–19 (incorporating prior argument in response to Durham's first motion for summary judgment, Doc. 30 at 22–25). Third, SPS argues that it is entitled to partial summary judgment because "pass-through litigation costs" advanced or reimbursed to CGAW do not fall within the definition of "account" under either the Factoring Agreement or the UCC. Id. at 21–26. In this regard, SPS asserts that pass-through litigation costs account for $424,869.60 of the payments to CGAW. Id. at 26. Fourth, SPS contends it is entitled to partial summary judgment because it paid CGAW $602,192 from March 6, 2014, to March 21, 2014, the time period when the Allonge purportedly was in effect. Id. at 26–28.[8]

---

[8] On September 1, 2016, SPS filed Defendant's Notice of Supplemental Authority (Doc. 111), bringing to the Court's attention Forest Capital, LLC v. BlackRock, Inc., No. 15-1551, 2016 WL 4207911

In its Response, Durham argues that the Factoring Agreement is not void as against public policy because SPS consented in writing to the assignment and so cannot now challenge it; Florida public policy favors assignment of rights to payment as a method of receiving working capital, as evidenced by Florida's adoption of UCC Article 9; SPS had waived the attorney-client privilege with respect to CGAW's invoices because it allowed disclosure of the invoices to LPS; and Durham only requested unprotected information (the invoices) and never requested privileged information from CGAW. Durham's Response at 5–10. Additionally, after the parties completed briefing on summary judgment, Durham filed a Notice of Supplemental Authority on January 29, 2016, notifying the Court of Santander Bank, N.A. v. Durham Commercial Capital Corp., No. 14-13133-FDS, 2016 WL 199408 (D. Mass. Jan. 15, 2016), in which the court

---

(4th Cir. Aug. 10, 2016) (unpublished), as a case purportedly related to its Choice of Law Memorandum. See Defendant's Notice of Supplemental Authority at 1. SPS states that the "case is directly relevant to the issues before this Court, and it is believed to be the first known opinion at the appellate level to hold that UCC § 9-406 does not create a private right of action." Id. Durham has moved to strike the Notice of Supplemental Authority as irrelevant to the issues before the Court. See Plaintiff Durham Commercial Capital Corp.'s Motion to Strike Defendant Select Portfolio Servicing, Inc.'s Notice of Supplemental Authority (Doc. 112). SPS responded that its Notice should not be stricken because it simply brings relevant information to the Court's attention. See Defendant Select Portfolio Servicing, Inc.'s Response in Opposition to Plaintiff's Motion to Strike (Doc. 113). Durham has requested leave to file a short reply to address the arguments in SPS's response. See Plaintiff Durham Commercial Capital Corp.'s Motion for Leave to File a Reply to Defendant Select Portfolio Servicing, Inc.'s Response to Plaintiff's Motion to Strike Notice of Supplemental Authority (Doc. 114).

Forest Capital has no relevance to the choice-of-law issues facing the Court, so it is not "supplemental authority" with respect to SPS's Choice of Law Memorandum. To the extent that SPS provides the case as additional authority supporting summary judgment in its favor, the Court observes that SPS did not argue in its Motion that UCC § 9-406 does not create a private right of action. As such, Forest Capital is not supplemental authority on any argument currently before the Court.

SPS also observes in a footnote that, despite agreeing in this case that New York law governs all UCC-related issues, Durham contended in another case that Florida law governed a dispute involving materially similar circumstances. See Defendant's Notice of Supplemental Authority at 2 n.1. The Court fails to see the relevance of Durham's representations in an unrelated case, particularly when both parties in this case agree that New York law governs all UCC-related issues.

Because SPS's Notice of Supplemental Authority attempts to raise a new argument and present otherwise irrelevant information, it is improper and so is due to be stricken. As such, the Court will grant Durham's motion seeking that relief. Finding a reply unnecessary, the Court will deny Durham's motion for leave to file a reply in support of its motion to strike.

concluded that the Factoring Agreement between Durham and CGAW was not void as against Massachusetts public policy. Doc. 77. Durham also responds that SPS is barred from asserting setoffs based on CGAW's purported breach of the Attorney Agreement because SPS did not dispute the invoices and waived any argument of breach when it paid the invoices to CGAW. Durham's Response at 11–13. Durham asserts that Florida Statutes section 679.4041(1)(b) bars SPS from asserting any setoff defenses because such defenses arose after SPS received the Notice of Assignment. Id. at 13–14. With regard to SPS's asserted exclusion of pass-through costs, Durham notes that SPS failed to raise such an exclusion as an affirmative defense in its Answer, and in any event such costs are within the scope of the Factoring Agreement, as SPS implicitly acknowledged when it paid invoices, including for such costs, between January 2013 and May 2014. Id. at 16–18. Finally, Durham contends that the Allonge never came into effect, and even if it did, it would not have relieved SPS of its obligation to honor the assignment until after CGAW paid the $3.2 million it owed to Durham. Id. at 18–19. Durham also argues SPS could not have relied on the Allonge because it did not have notice of the Allonge, and neither Durham nor CGAW formally withdrew the Notice of Assignment. Id. at 19–20.

### 1.    Void as Against Public Policy

SPS argues that the Factoring Agreement is void as against public policy because, by its terms, it required CGAW to violate the Florida Bar's Rules of Professional Conduct. Motion at 11–18. Although SPS contends that the Factoring Agreement is contrary to rules relating to confidentiality, zealous advocacy, and the exercise of independent judgment, the terms of the agreement itself only implicate the first of those rules. To the extent SPS asserts that Durham's pervasive control over CGAW in fact violated the latter

two principles, SPS identifies no evidence that such alleged control arose from any particular term of the Factoring Agreement. Instead, SPS points only to the parties' conduct after CGAW allegedly breached the Factoring Agreement and its financial condition began to rapidly deteriorate. Without any evidence that the Factoring Agreement itself mandated the alleged breaches of ethics, the Court cannot conclude that such breaches warrant voiding the agreement. Thus, for the purposes of evaluating SPS's argument that the Factoring Agreement is void as against public policy, the Court considers only whether the agreement required CGAW to violate its ethical obligation of confidentiality to SPS.[9]

Although the Factoring Agreement designates New York law as the law governing the agreement, SPS bases this defense on its contention that the Factoring Agreement violates Florida public policy. Moreover, because Durham has sued SPS in a court located in Florida, Florida law governs the question of whether the contract violates public policy.[10] See Harris v. Gonzalez, 789 So. 2d 405, 409 (Fla. 4th DCA 2001) ("Although it

---

[9] To the extent SPS relies on the access and disclosure provisions in paragraphs 3.5 and 3.6 of the Factoring Agreement, see Factoring Agreement at 3, as providing Durham with the contractual authority to interfere with CGAW's exercise of independent judgment, the Court's subsequent analysis with respect to the alleged violations of confidentiality applies.

[10] Durham asserts that New York law applies to this defense because it relates to the validity of the Factoring Agreement, while Massachusetts law applies to the extent the Court must determine whether CGAW's lawyers breached ethical rules. Durham's Choice of Law Memo. at 7–9. SPS asserts that Florida law applies because at least some of the legal services underlying the accounts on which Durham seeks to recover were performed in Florida by Florida lawyers governed by the Florida Rules of Professional Conduct. SPS's Choice of Law Memo. at 11–12. Both parties focus to an extent on whether application of New York law would violate Florida public policy. See Durham's Choice of Law Memo. at 8–12; SPS's Choice of Law Memo. at 11. But the question before the Court is not whether it should honor the Factoring Agreement's choice of law provision; instead, the question before the Court is whether it should enforce the Factoring Agreement in light of its asserted conflict with the public policy of the forum state. For the reasons stated, the Court concludes that Florida law governs this affirmative defense.

In any event, as a practical matter, it makes no difference whether Florida law, New York law, or Massachusetts law governs the issue of whether the Factoring Agreement violates public policy because each state has rules imposing ethical obligations of confidentiality on attorneys. See Fla. Bar R. 4-1.6; N.Y. R. Prof'l Conduct 1.6; Mass. R. Prof'l Conduct 1.6. Thus, SPS's argument—that the Factoring Agreement is void because it violates public policy as embodied in state bar rules of professional conduct requiring

is true that Florida cannot apply its public policy and statutes to a foreign contract to void its operation elsewhere, it can hold such a contract void or unenforceable here if said contract is repugnant to the public policy of this state."); see also Title & Trust Co. of Fla. v. Parker, 468 So. 2d 520, 523 (Fla. 1st DCA 1985) ("[A]s a general rule, if the enforcement of a contract is contrary to the public policy of the forum state, the contract need not be enforced."). SPS argues that (1) the Florida Bar's Rules of Professional Conduct can and do establish public policy in Florida; (2) the Factoring Agreement required CGAW to violate its ethical obligations under those rules such that it violated public policy because it required CGAW to offer Durham unfettered access to its equipment, systems, records, and other business information; and (3) that fact warrants voiding the Factoring Agreement in its entirety. SPS's Motion at 11–18 (citing Factoring Agreement at 3, ¶¶ 3.5, 3.6).

The Court need not address the first two components of SPS's arguments because it concludes that, even assuming the cited provisions of the Factoring Agreement violated public policy, viewing the evidence in the light most favorable to Durham, there is at least a genuine dispute as to whether the allegedly violative provisions warrant voiding the entire Factoring Agreement. The decision in Santander Bank, N.A. v. Durham Commercial Capital Corp., No. 14-13133-FDS, 2016 WL 199408 (D. Mass. Jan. 15, 2016), is persuasive.[11] The court in that case was faced with the very same Factoring

---

lawyers to protect confidential client information—would require the same analysis regardless of the applicable law.

[11] Santander Bank is new authority that became available only after the parties had completed briefing on summary judgment. Nevertheless, Durham brought the case to the Court's attention by filing a Notice of Supplemental Authority (Doc. 77), and SPS did not request leave to file a reply to address the case. Moreover, the case on which Santander Bank relies, Counsel Fin. Servs., L.L.C. v. Leibowitz, No. 13-12-00103-CV, 2013 WL 3895331 (Tex. App. 2013), is not new authority. Durham cited Leibowitz in its response to SPS's Motion, and in Durham's Motion, Durham quoted Leibowitz's holding in analogous

Agreement between the very same parties—Durham and CGAW. See id. at *2. The account debtor (in that case, the plaintiff) argued that the Factoring Agreement was void as against Massachusetts public policy because it required disclosure of confidential client information. Id. at *6. Viewing the facts in the light most favorable to the account debtor, the court determined that CGAW's lawyers had violated Massachusetts's rules of professional conduct in disclosing client information under the Factoring Agreement. Id. at *7. Nevertheless, it concluded as a matter of law that the Factoring Agreement remained enforceable because the allegedly violative provisions were tangential to the primary purpose of the agreement. Id. In doing so, the Court noted that the purpose of the agreement could be accomplished without disclosure of confidential information, and Massachusetts law favored salvaging an otherwise valid agreement where only one insignificant portion of the agreement violated public policy. Id.

Here, New York law governs the question of whether the provisions at issue are tangential to the primary purpose of the Factoring Agreement and are therefore severable.[12] Under New York law, whether a term of a contract is severable "depends largely on the intent of the parties as reflected in the language they employ and the particular circumstantial milieu in which the agreement came into being." Matter of Estate of Wilson, 405 N.E.2d 220, 223 (N.Y. 1980). SPS has failed to present any evidence or argument in support of the proposition that the entire Factoring Agreement fails simply

---

circumstances that a security agreement was not void as against public policy based on particular provisions of the agreement that allegedly violated state bar disciplinary rules because those provisions were "tangential to the main or essential purpose of the agreement, which [was] the pledge of collateral to secure the loan." See Durham's Response at 10; Durham's Motion at 37 (quoting Leibowitz, 2013 WL 3895331, at *9). Durham's citation to Leibowitz sufficiently raised the issue of severability, and SPS presented no argument on the issue.

[12] As previously discussed, the parties agree that New York law governs all issues requiring interpretation of the Factoring Agreement. See supra at 15 n.7.

because an ancillary provision violates public policy. Rather, its public-policy argument simply assumes this proposition applies in all circumstances. New York law suggests otherwise. See Cent. N.Y. Tel. & Tel. Co. v. Averill, 92 N.E. 206, 209–10 (N.Y. 1910) (finding provision of contract restraining competition void as against public policy but concluding the provision was severable from the primary agreement). Because SPS has not established as a matter of law that the entire Factoring Agreement is void by virtue of its provisions arguably requiring disclosure of confidential information in violation of Florida public policy, it is not entitled to summary judgment on this basis.[13]

### 2.    Breach of Attorney Agreement

SPS asserts it is entitled to summary judgment in its favor because CGAW materially breached the Attorney Agreement by (1) disclosing confidential information and (2) failing to inform SPS of events adversely impacting the firm's financial stability. SPS's Motion at 18–20. SPS is not entitled to summary judgment in its favor on this basis.

As to the alleged disclosure of confidential information, SPS has failed to identify evidence showing that CGAW ever actually disclosed information qualifying as "confidential" under the Attorney Agreement to Durham. At most, SPS points to an exemplar invoice presented to former CGAW shareholders during their respective depositions and evidence that Durham and its employee Mosher had "access" to such information. SPS's Motion at 5–7. However, SPS's consent to the Factoring Agreement reflected its acquiescence to disclosure of (1) the fact of its need for representation and

---

[13] Indeed, as the Court will discuss later in the context of Durham's Motion, see infra at 39-41, the Court concludes as a matter of law that the provisions arguably requiring disclosure of confidential information are tangential to the central purpose of the agreement and are therefore severable. Because the Court addresses SPS's Motion in this portion of its Order, it is sufficient to conclude that SPS has not demonstrated sufficient grounds for judgment in its favor.

(2) the fees it was charged, because those two pieces of information were necessarily implicated in the existence of any factoring arrangement; otherwise, Durham would have no way of knowing who owed it money or how much was owed. Moreover, SPS fails to provide any evidence that the information on the invoice would be classified as "confidential" under the Attorney Agreement. SPS points to the testimony of Connolly, Scofield, and Willard to support its assertion that the invoice contained either attorney-client or work-product privileged material. See SPS's Motion at 6 (citing Connolly Depo. at 32–33; Scofield Depo. at 27; Willard Depo. at 37). Although providing some evidence that CGAW's shareholders saw a potential ethical obligation to protect the information, SPS offers no additional evidence that disclosure of such information violated the confidentiality provisions of the Attorney Agreement. Instead, SPS asks the Court to assume that such information was protected under the contract. Viewing the evidence in the light most favorable to Durham, the Court cannot determine as a matter of law that the single referenced invoice demonstrates disclosure of confidential information as that term is defined in the Attorney Agreement.

As to Durham's alleged access to confidential information, SPS identifies no evidence that CGAW actually disclosed confidential information of SPS to Durham or Mosher. Instead, SPS points to Mosher's access to CGAW's operating account, use of check-writing authority on the firm's behalf, admission that he contacted firm clients to follow up on past-due invoices, and redirection of CGAW's mail. See SPS's Motion at 6–7 (citing, inter alia, Mosher Depo. at 39, 48, 66; Cedrone Depo. at 8, 38, 50, 52, 54). However, none of that evidence establishes, as a matter of law, a breach of CGAW's contractual obligation to protect SPS's confidential information.

As to CGAW's alleged failure to disclose events having an adverse impact on its financial condition, SPS has presented evidence that CGAW's shareholders learned in August 2013 that millions of dollars of client trust funds had been misappropriated but consciously decided against telling clients for fear of causing the firm to collapse. See Connolly Depo. at 47–48, 52; Scofield Depo. at 11–14, 17. Durham cites no evidence contradicting those facts. In light of the significant amount of money implicated and the shareholders' own belief that the information, if made public, could cause the firm's collapse, SPS has demonstrated that there is no genuine dispute that CGAW breached paragraph 3.6 of the Attorney Agreement in failing to disclose that information. See Attorney Agreement at 7 ¶ 3.6.

However, even assuming CGAW breached the Attorney Agreement by disclosing confidential information and/or failing to inform SPS of events adversely affecting CGAW's financial stability, it has not presented evidence allowing the Court to conclude as a matter of law that those breaches were material. "Whether a breach of a contract constitutes a material breach is a question of fact. Therefore, the issue will ordinarily be resolved by the fact finder, and summary judgment should be granted with great caution." Cross v. Olsen, 303 P.3d 1030, 1036 (Utah Ct. App. 2013) (internal quotation marks, citations, and alterations omitted).[14] "The relevant question is not whether the breach goes to the heart of the provision breached, but whether it goes to the heart of the contract

---

[14] The parties agree that Utah law governs the Court's interpretation of the Attorney Agreement. Durham's Choice of Law Memo. at 8, 20; SPS's Choice of Law Memo. at 9–11. The Attorney Agreement contains a choice-of-law provision identifying Utah law as the governing law. See Attorney Agreement at 18. For the reasons discussed supra at 15 n.7, the Court will honor that provision and apply Utah law in evaluating whether CGAW's actions violated the Attorney Agreement and whether any such violations constituted a material breach of that agreement. To the extent Utah law would permit SPS to rescind the Attorney Agreement and refuse to make payments based on a material breach, New York law then governs the question of whether SPS could rely on that right as a defense to payment pursuant to UCC § 9-404(a).

itself." Id. Thus, "[a] rescission is not warranted by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement." Id. Because there is a genuine dispute as to whether the alleged breaches of the Attorney Agreement were material, the Court cannot conclude as a matter of law that SPS may avoid its obligation to pay Durham for CGAW's work under the Attorney Agreement altogether. Moreover, to the extent SPS contends it is entitled to a setoff based on damages it sustained from the breaches, whether material or not, SPS has offered no evidence of the amount of any such damages. For these reasons, SPS is not entitled to summary judgment in its favor based on CGAW's alleged breaches of the Attorney Agreement.

### 3.    Pass-Through Litigation Costs

SPS argues it is entitled to summary judgment in its favor to the extent of the $424,869.60 it paid to CGAW was for litigation costs that "passed through" CGAW to third-party vendors, a sum which it contends was, as a matter of law, excluded from the scope of the Factoring Agreement. SPS's Motion at 21–26. SPS further asserts that the Factoring Agreement and the UCC both define "account" as including, as relevant here, only payments for CGAW's services. Id. at 21–22. SPS cites several cases to support its argument that courts narrowly define "account" in this context in a way that excludes incidental costs or expenses. Id. at 22–26.[15] In response, Durham contends that pass-

---

[15] In the Response, Durham observes that none of SPS's 15 affirmative defenses addresses this argument. Durham's Response at 16. In responding to a pleading, a defendant "must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c). Failure to do so generally results in a waiver of the right to raise that issue at trial. Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988). However, if the opposing party received notice of a defense through means other than the pleadings, or if the party otherwise can show no prejudice from the failure to plead the defense, a defendant might not have waived its right to present the defense. See id. Although Durham observed that SPS had not raised this defense in its Answer, Durham elected to respond to the merits of the defense anyway. See id. at 16–18. Because Durham does not indicate whether it had previously learned of the defense informally and does

through litigation costs are within the scope of the Factoring Agreement. Durham explains that the Attorney Agreement defined "Services" to include such costs, and the Notice of Assignment put SPS on notice that SPS was obligated to pay such costs to Durham because the Notice referenced payments for "invoices" and "billing," both of which at times included costs. See Durham's Response at 16. Durham also argues that the UCC applies to both "accounts" and "payment intangibles," and that the cases SPS cites are distinguishable. Id. at 16–18. Finally, Durham contends SPS waived any argument that pass-through costs are outside the scope of the Factoring Agreement because, for more than a year, SPS paid Durham the full amount of CGAW's invoices, including invoices for such costs. Id. at 18.

Viewing the evidence in the light most favorable to Durham, the Court cannot conclude as a matter of law that CGAW's assignment of its "accounts receivable" to Durham excluded pass-through costs.[16] A genuine dispute exists as to the scope of the definition of "account" under the Factoring Agreement. In interpreting an agreement governed by the UCC, a court may consider the parties' course of performance regardless of whether the written terms of the contract are ambiguous. See N.Y. U.C.C. §§ 1-201(b)(3)[17] (defining "Agreement" as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course

---

not contend that it was prejudiced by SPS's failure to raise the defense in its Answer, the Court will address its merits. See Bergquist v. Fid. Info. Servs., Inc., 197 F. App'x 813, 815–16 (11th Cir. 2006).

[16] The parties agree that this defense is governed by New York law and New York's codification of the UCC. See Durham's Choice of Law Memo. at 7, 19; SPS's Choice of Law Memo. at 7–8. As previously discussed, the Court has concluded that New York law applies to any defense, including this defense, based on the UCC. See supra at 15 n.7.

[17] Section 1-102 provides that Article 1 of the UCC "applies to a transaction to the extent that it is governed by another article of this act." N.Y. U.C.C. § 1-102.

of dealing, or usage of trade as provided in Section 1-303.") & 1-303(d) ("A course of performance … between the parties … is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to the specific terms of the agreement, and may supplement or qualify the terms of the agreement.")[18]; Westinghouse Credit Corp. v. Shelton, 645 F.2d 869, 872 n.3 (10th Cir. 1981)[19] (finding court could consider course of performance in interpreting security agreement under Article 9 of the UCC); In re Inofin Inc., 512 B.R. 19, 73–77 (Bankr. D. Mass. 2014) (approving of reference to parties' course of performance in interpreting contract without regard to existence of ambiguity); Gen. Elec. Capital Commercial Auto. Fin., Inc. v. Spartan Motors, Ltd., 675 N.Y.S.2d 626, 633–34 (N.Y. App. Div. 1998) ("It is well[-]established that the terms of a written security agreement may be amplified by other circumstances[,] including course of dealing or usage of trade or course of performance. … Here, GECC does not deny that, although the written terms of GMAC's contract with Spartan appeared to contemplate a single method of inventory financing, … in fact it was not at all unusual for the parties to pursue the same end by somewhat different means." (internal quotation marks and citations omitted; emphasis in original)). Regardless, the Court readily concludes that the definition of "account" in the Factoring Agreement is ambiguous because it is unclear whether the definition would include pass-through costs incidental

---

[18] See also N.Y. U.C.C. § 1-303, Official Cmt. 1 ("The Uniform Commercial Code rejects both the 'lay-dictionary' and the 'conveyancer's' reading of a commercial agreement. Instead[,] the meaning of the agreement of the parties is to be determined by the language used by them and by their action." (emphasis added)).

[19] Because the UCC is a uniform law adopted by all 50 states, "the Court will consider decisions from other state and federal courts interpreting" relevant UCC provisions. In re WorldCom, Inc., 339 B.R. 56, 63–64 (Bankr. S.D.N.Y. 2006); see also In re Lou Levy & Sons Fashions, Inc., 988 F.2d 311, 316 n.5 (2d Cir. 1993) ("Since one of the major goals of the U.C.C. is uniformity, interpretations of the U.C.C. by the courts of other states serve as more than mere persuasive authority." (internal quotation marks omitted)).

to, and necessary for, CGAW's services.[20] The Factoring Agreement defines "Account" as an obligation "for the payment of money arising out of the sale by [CGAW] of goods or the performance by [CGAW] of services." Doc. 64-5 at 16. The Court cannot conclude that that definition unambiguously excludes pass-through costs. In light of that ambiguity, the Court may consider the parties' course of performance in interpreting the definition.

Here, evidence of the course of performance among all parties involved in the factoring arrangement indicates that, between January and November 2013, SPS made all payments on all invoices to Durham without objection from CGAW.[21] See McGrain Decl. at 5. That evidence is relevant to interpretation of the Factoring Agreement, which is governed by Article 9 of the UCC, and it precludes a finding that the agreement indisputably excluded such costs.

The cases SPS cites do not compel a different conclusion. Indeed, SPS concedes that it found no case law addressing whether the specific type of costs at issue in this case are within the UCC definition of "account," SPS's Motion at 22, and the Court has found none. Nevertheless, SPS attempts to analogize this case to other cases in which courts considered the scope of that definition. Id. at 22–26. However, those cases are simply too dissimilar from the circumstances before the Court in this case at this stage of the proceedings.[22]

_____

[20] Determination of whether a contract is ambiguous is a question of law. Bailey v. Fish & Neave, 868 N.E.2d 956, 959 (N.Y. 2007).

[21] Although Durham does not expressly argue that the Court may consider course of performance in interpreting the Factoring Agreement, it invites the Court to do so in arguing that SPS waived any contention that pass-through costs are excluded from the scope of the agreement because SPS had previously paid invoices for such costs to Durham. See Durham's Response at 18. Having received notice of Durham's argument, SPS could have sought leave to file a reply arguing that consideration of extrinsic facts related to the parties' performance would be inappropriate. It did not do so.

[22] For example, SPS cites In re Koppinger, 113 B.R. 588 (Bankr. D.N.D. 1990), and CIT Group/Commercial Services, Inc. v. Constellation Energy Commodities Group, Civil No. 12-16-ART, 2012

Because the Court concludes that SPS has failed to establish as a matter of law what the definition of "Account" in the Factoring Agreement includes pass-through costs, SPS is not entitled to partial summary judgment to the extent it paid CGAW directly for such costs.

### 4.    Payments During the Effective Period of the Allonge

SPS contends that the plain language of the Allonge indicates that all payments SPS made to CGAW on new invoices issued between March 6, 2014, and March 21, 2014—totaling $602,192, by SPS's estimate—were properly paid directly to CGAW because Durham had no right to those payments under the Factoring Agreement as modified by the Allonge. SPS's Motion at 26–28. Anticipating Durham's response, SPS also argues that the use of the "null and void" language in the Allonge does not mean that the Allonge was void ab initio upon CGAW's failure to receive the required cash infusions because such an interpretation would run contrary to the plain language of the Allonge and a cohesive interpretation of the document as a whole. Id. at 27. SPS suggests that it would make no sense to read the Allonge as retroactively revoking CGAW's right to use payments on new invoices. Id. Durham responds that the Allonge never had any effect because CGAW never provided proof of the required cash infusions. Durham's Response at 18–19. It argues that even if the Allonge was in effect for some short period of time, it did not release SPS from the terms of the assignment until CGAW paid its $3.2 million

---

WL 4603049 (E.D. Ky. Sept. 30, 2012). SPS's Motion at 23–24. However, in those cases the courts made their determinations based on the unambiguous language of the agreements, considering the nature of the agreements and the specific payments at issue. SPS's citation to In re CHA Hawaii, LLC, 426 B.R. 828 (Bankr. D. Haw. 2010), is similarly unhelpful. The pertinent portion of that decision reads, "The Return of IIC Deposit ($100,000) and Refund of BK Deposit ($132,519) are not proceeds of Accounts." CHA, 426 B.R. at 836. The decision provides no discussion of what the returns of deposit were or why the debtor received them. With so little information, CHA provides little, if any, support for SPS's argument.

outstanding balance to Durham. Id. at 19. Finally, it contends that SPS cannot rely on the Allonge because it indisputably was not aware of the Allonge's existence until long after it had become void. Id.

The Court concludes that there is no genuine dispute as to whether the Allonge was in effect for some period of time.[23] Use of the language "null and void" does not necessarily mean the same thing as "void ab initio." See Ewell v. Daggs, 108 U.S. 143, 148–49 (1883). In determining the effect of language rendering a contract "null and void" upon occurrence or nonoccurrence of an event, a court must read the contract as a whole. Application of First Republic Bldg. Corp., 247 N.Y.S.2d 35, 37 (N.Y. App. Div. 1964). The Allonge provided that it "will be in effect until March 21, 2014, at which time it will become null and void unless" CGAW received the required cash infusions. Allonge at 1. The plain language of the Allonge unambiguously indicates that it was to be in effect until March 21, 2014, and thereafter it would remain in effect only if CGAW received cash infusions. That language cannot reasonably be read to establish conditions precedent to the Allonge having any effect for any time period. Nor does it support interpreting the Allonge as becoming void ab initio (that is, retroactively of no legal effect at all). The definitions of "null," "void," and "void ab initio" in Black's Law Dictionary support this interpretation. See Black's Law Dictionary (9th ed.) at 1172, 1709 (defining "null" as "[h]aving no legal effect; without binding force"; "void" as "[o]f no legal effect"; and "void ab initio" as "null from the beginning, as from the first moment when a contract is entered into"[24] (emphasis added)).

---

[23] The parties agree, and the Court concludes, that New York law governs the Court's interpretation of the Allonge. See Durham's Choice of Law Memo. at 7–8, 19; SPS's Choice of Law Memo. at 8.

[24] As to "void ab initio," Black's Law Dictionary further explains: "A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract." Id. at 1709 (emphasis added). For the reasons described in this Order, the Court

Durham points to no authority to the contrary. The Court concludes that the use of the phrase "null and void" was intended to make the Allonge voidable at the option of Durham if CGAW failed to provide proof of the required cash infusions. Reading the Allonge as a whole, it would be unreasonable to interpret the language as rendering the Allonge an absolute nullity—that is, retroactively of no legal effect <u>even if</u> the parties wanted to continue it. CGAW's failure to provide satisfactory evidence of the cash infusions necessary to prevent the Allonge from becoming null and void as of March 21 did no more than terminate the Allonge going forward.

Durham asserts in part that it did not agree to withdraw the Notice of Assignment until CGAW paid Durham back in full. Durham's Response at 18–20. That argument raises the question of whether, notwithstanding the effectiveness of the Allonge, SPS remained obligated to pay Durham instead of CGAW simply because the Notice of Assignment had not been withdrawn formally. The parties cited no authority on this issue in their briefing on summary judgment. Nevertheless, Durham's apparent position—that SPS remained obligated to pay Durham regardless of whether the Allonge ceased factoring of certain invoices because Durham never withdrew the Notice of Assignment— is unavailing. Although section 9-406(a) of the UCC states that, after receiving notice of an assignment, an "account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor," that provision necessarily requires an actual assignment. The effectiveness of a general notice of assignment simply cannot exist independent of an actual assignment of a particular account. Official

---

concludes that use of the phrase "null and void" rendered the Allonge merely voidable by Durham once CGAW failed to provide proof of the required cash infusions.

Comment No. 4 to section 9-406 effectively states as much, albeit in the context of addressing the effectiveness of a notice of assignment when an account debtor has requested proof of the assignment. See N.Y. U.C.C. § 9-406, Official Cmt. 4. Although the Comment concludes that a notice of assignment is effective "even if the proof [of assignment] is not seasonably forthcoming," it also observes: "Of course, if the assignee did not in fact receive an assignment, the account debtor cannot discharge its obligation by paying a putative assignee who is a stranger." Id. That statement suggests what common sense also dictates—that a notice of assignment obligates an account debtor to pay the purported assignee only to the extent there is an actual, valid assignment from the assignor. Cf. Platinum Funding Servs., LLC v. Petco Insulation Co., No. 3:09cv1133 (MRK), 2011 WL 1743417, at *9 (D. Conn. May 2, 2011) ("The language of UCC § 9-406 … presumes that an 'assignor' has already assigned its right to receive payment from an account debtor to an assignee. … Because the right to receive payments on … particular invoices was never assigned to Platinum Funding, UCC § 9-406 … [is] of no help to Platinum Funding's cause." (emphasis in original)). Accordingly, it makes no difference in this case whether SPS knew of the Allonge or received notice that the assignment was no longer in effect. If the Allonge precluded the assignment of at least some invoices and permitted CGAW to retain and use payments on those invoices, as SPS contends, Durham has no claim to amounts SPS paid CGAW on such invoices.

The Court concludes that no genuine dispute exists as to whether the Allonge allowed CGAW to collect and retain payments on certain new invoices. The plain language of the Allonge states that certain new invoices would "go directly to the clients of CGAW and [would] not be factored by Durham," and CGAW was "free to retain,

deposit[,] and use any payments on such invoices." Allonge at 1. Durham argues that the Allonge did not allow CGAW to retain payments or SPS to ignore the Notice of Assignment until CGAW first paid the $3.2 million it owed to Durham under the Factoring Agreement. Durham's Response at 19–20. But Durham misreads the Allonge. The Allonge provided that (1) Durham would keep sums that otherwise would be due to CGAW under the Factoring Agreement to the extent CGAW's clients paid those sums on accounts receivable that Durham had already factored (¶ 1); (2) CGAW would replace Old Accounts (those remaining unpaid for more than 91 days) with Replacement Invoices of equal value and would be permitted to retain any money it collected on the Old Accounts after the exchange (¶¶ 3–5); (3) CGAW would send new billing not provided as Replacement Invoices directly to its clients and could "retain, deposit[,] and use any payments" on such invoices (¶ 6); (4) if Durham received any payments on new invoices not designated as Replacement Invoices, it would forward such payments to CGAW and would "have no claim or right to any such payments" (¶ 7); and (5) once CGAW had paid Durham $3.2 million, Durham would forward <u>all</u> subsequent payments to CGAW; Durham would notify CGAW's clients to send future payments to CGAW and not Durham; and the parties would "release each other from further claims, liability, or causes of action" (¶¶ 10–11). Allonge at 1–2. In short, the Allonge provided that Durham would continue to accept payment on existing factored accounts and would retain amounts otherwise due to CGAW on such accounts; CGAW would replace past-due accounts with new ones; CGAW would receive and retain all payments on new invoices not provided as replacement accounts; and the parties would continue with that arrangement until CGAW had paid the $3.2

million it owed under the Factoring Agreement.[25] The Allonge did not state, as Durham contends, that CGAW could only retain payments once it had repaid Durham in full.

Although the Court has concluded that the Allonge allowed SPS to make some payments directly to CGAW, SPS is not entitled to summary judgment with respect to the full $602,192 it claims it paid while the Allonge was in effect. First, it is unclear when the Allonge was in effect. Paragraph 6 of the Allonge, on which SPS relies, is ambiguous. It first references "[a]ll new billing for CGAW, commencing after March 6, 2014." Allonge at 1. However, the next sentence refers to "invoices issued after the effective date of this Allonge." Id. On the last page of the Allonge, beneath the parties' signatures, the original typed effective date of March 6, 2014, was altered by hand to reflect a March 20, 2014, effective date. Id. at 3. In light of that alteration, the statements in Paragraph 6 are inconsistent. It is unclear whether the parties contemplated Paragraph 6 to apply to billing after March 6, 2014—which was also the original effective date of the Allonge—or only billing after the actual effective date of March 20. As such, because a genuine dispute exists as to the effective period of Paragraph 6 of the Allonge, the Court cannot determine as a matter of law that all payments SPS made to CGAW from March 6, 2014, through March 21, 2014, were excluded from the Factoring Agreement.

Second, SPS has presented no evidence that the invoices it paid to CGAW between March 6, 2014, and March 21, 2014, were not Replacement Invoices. As previously discussed, Paragraph 6 of the Allonge permitted CGAW to "retain, deposit[,]

---

[25] McGrain had a very different interpretation of the Allonge. See McGrain Depo. at 107–12. He appeared to read the Allonge as permitting CGAW to retain funds on new invoices only if those invoices were for services provided to clients not already on notice of the Factoring Agreement. Id. at 110–12, 117–18. However, to the extent his interpretation conflicts with the plain language of the document, the Court declines to give that interpretation weight.

and use" payments on certain new invoices only to the extent those new invoices were not provided to Durham as Replacement Invoices. See Allonge at 1. Without any evidence establishing that the invoices at issue were not Replacement Invoices, the Court cannot determine as a matter of law that SPS properly paid them to CGAW. Therefore, a genuine dispute exists as to the amount SPS was permitted to pay directly to CGAW under the Allonge.

### C.      Durham's Motion

Durham seeks summary judgment as to several issues. First, Durham argues it is entitled to summary judgment as to its prima facie case because there is no genuine dispute that (1) SPS received the Notice of Assignment; (2) SPS was an account debtor of CGAW; and (3) SPS paid invoices to someone other than Durham. Durham's Motion at 22–24. Durham also argues it is entitled to summary judgment in its favor as to 14 of SPS's 15 affirmative defenses.[26]

SPS responds to some, but not all, of Durham's arguments. With respect to Durham's prima facie case, SPS argues that Durham has failed to establish that all payments SPS made to CGAW were on "accounts" as defined under the Factoring Agreement. SPS's Response at 3–4. SPS argues that it did not waive its setoff and

---

[26] Durham presents no argument with respect to SPS's Fourteenth Affirmative Defense, in which SPS asserts that, "[t]o the extent that Durham's alleged interest was subordinate to that of a preexisting secured creditor, Durham did not have a right to claim entitlement to [CGAW's] receivables." Answer at 11. Without any evidence or argument on that affirmative defense, the Court will not address its merits. Because at least one affirmative defense remains in the case, Durham is entitled to, at most, only partial summary judgment.

The Court also observes that Durham does not expressly seek summary judgment with respect to SPS's newly raised affirmative defense that pass-through litigation costs SPS paid to CGAW did not fall within the definition of "accounts." See generally Durham's Motion. Durham filed its motion several days after SPS first raised that argument in its own motion, and Durham did not request leave to supplement its own motion to address that defense. As such, that defense remains in the case as well.

recoupment defenses by paying CGAW because it was unaware of alleged breaches of the Attorney Agreement forming the foundation of those defenses when it paid CGAW. Id. at 13–15. It also contends its setoff and recoupment defenses are governed by section 9-404(a)(1), not section 9-404(a)(2). Id. at 16. SPS's responses to Durham's arguments concerning the Allonge and SPS's contention that the Factoring Agreement is void as against public policy largely mirror its arguments in its own Motion. See id. at 4–13, 17–19. Finally, with respect to laches and unclean hands, SPS argues that Durham, through McGrain, knew of Ablitt's instruction as early as February 2014 and never attempted to intervene to prevent SPS from paying CGAW. Id. at 19–20.

### 1. **Prima Facie Case**

Durham asserts there is no genuine dispute that (1) SPS received authenticated notification of the assignment of CGAW's accounts receivable; (2) SPS was an account debtor of CGAW; and (3) SPS paid invoices to someone other than Durham. Durham's Motion at 22–24. SPS contends that Durham has not established that all payments SPS made to CGAW were on "accounts," specifically pointing to its contention that payments for pass-through costs are not within the definition of "account" under the Factoring Agreement. SPS's Response at 3–4. The Court has concluded that a genuine dispute exists as to whether the definition of "accounts" under the Factoring Agreement includes such pass-through costs. See supra at 26-30. Even if the Court ultimately finds that the nearly $425,000 in costs was not within the scope of the Factoring Agreement, as SPS contends, SPS has admitted to paying approximately $1.2 million to CGAW. Thus, as much as about $775,000 would not be excluded from the definition of "account" under the Factoring Agreement or the UCC.

However, to SPS's broader point, Durham has not provided any evidence that the amounts SPS paid were actually on accounts purchased by and assigned to Durham. In this regard, Durham's statement of the elements it must prove for its claim is incomplete. To establish its prima facie case, Durham must show that SPS paid CGAW on invoices that had been assigned to Durham. It is not enough to show simply that SPS had general notice of an assignment of accounts and that SPS thereafter paid CGAW instead of Durham. If Durham did not purchase a particular account, it would not be entitled to payment from SPS notwithstanding SPS's receipt of the Notice of Assignment. In other words, although the Notice of Assignment states that "the accounts receivable of [CGAW] have been assigned to Durham," see Notice of Assignment, that notice is effective against SPS only to the extent that CGAW actually did assign particular accounts to Durham. Cf. N.Y. U.C.C. § 9-406, Official Cmt. 4.

Durham appears to take the position that it factored all of CGAW's accounts, such that any payment on any invoice necessarily should have gone to Durham. McGrain testified that "[a]ny funds being paid to [CGAW] by SPS" would have been "subject to" the Factoring Agreement. McGrain Depo. at 53–54. However, the Factoring Agreement itself suggests that Durham could decide which accounts to purchase, and such accounts would be listed on a schedule. See Factoring Agreement at 4. Indeed, the Factoring Agreement apparently contemplated Durham's purchase of only "Acceptable Accounts," defined as "Account[s] offered by [CGAW] to Durham for sale which Account[s] Durham has reviewed and has, in its sole discretion, approved for purchase in whole or in part." Id. at 1, 4. The Factoring Agreement also provided that CGAW would repurchase accounts under certain circumstances. Id. at 7. Feige testified that CGAW sometimes

repurchased invoices that had not been paid for 90 days, and CGAW would retain any payment it collected on such repurchased accounts.[27] Feige Depo. at 35–37. Moreover, any account that arose during the effective period of the Allonge would not have been factored. See supra at 34-36. In light of that evidence, the Court cannot conclude that Durham had been assigned the accounts associated with the $1.2 million in payments from SPS to CGAW.[28]

To the extent that Durham contends it can establish its prima facie case without any evidence that the particular accounts at issue were assigned, based solely on SPS's receipt of the Notice of Assignment, Durham's contention is contrary to both law and common sense, as previously discussed. See supra at 32-33. A genuine dispute exists as to whether Durham factored the accounts for which it now seeks payment. Durham is not entitled to summary judgment in its favor with respect to its prima facie case.

### 2.    SPS's First Affirmative Defense

As to SPS's First Affirmative Defense, Durham asserts that the Factoring Agreement is not void as against public policy because SPS consented in writing to the assignment; SPS had waived the attorney-client privilege with respect to its invoices from

---

[27] Feige testified that CGAW repurchased accounts on a weekly basis between February and early November 2013, but that subsequently Durham's reporting of overdue accounts became "choppier and choppier and then it just ended altogether," preventing CGAW from being able to determine which accounts needed to be repurchased. Feige Depo. at 35–36. Durham asserts that all of SPS's allegedly misdirected payments occurred from December 2013 to June 2014. Durham's Motion at 14. Nevertheless, because it is possible that some of the amounts SPS paid to CGAW were for overdue accounts that CGAW had repurchased, the Court cannot conclude on the record before it that Durham has established its prima facie case as a matter of law.

[28] To be sure, it appears to be undisputed that Durham had a right to payment on some accounts on which SPS paid CGAW instead of Durham. See Feige Depo. at 93 (acknowledging that "there was some amount of money that was deposited by the law firm that should have passed on to Durham"). But it does little to advance the case for the Court to declare that SPS paid some undefined amount to CGAW which it should have paid to Durham. Even with such a finding, to recover on its claim, Durham would need to come forward with evidence of the specific accounts purchased by and assigned to it to establish the existence of an assignment that SPS failed to honor.

CGAW because it allowed their disclosure to LPS; Durham never requested protected information from CGAW; and all courts that have addressed the issue have concluded that similar financing agreements are not void as against public policy or state bar ethics rules. Durham's Motion at 32–37. The Court previously determined that SPS failed to demonstrate that it is entitled to summary judgment in its favor on the basis that the Factoring Agreement was void as against public policy. See supra at 23. The Court now concludes that, viewing the evidence in the light most favorable to SPS, there is no genuine dispute as to whether the provisions at issue are severable from the remainder of the Factoring Agreement.

The Court determines, as did the court in Santander Bank, that the Factoring Agreement is not void by virtue of its provisions potentially requiring disclosure of confidential information because those provisions are tangential to the main purpose of the agreement. See Santander Bank, 2016 WL 199408, at *7. As previously discussed, under New York law, whether a term of a contract is severable "depends largely on the intent of the parties as reflected in the language they employ and the particular circumstantial milieu in which the agreement came into being." Estate of Wilson, 405 N.E.2d at 223. Here, "[t]he two actions—disclosing confidential information and assigning accounts receivable—are related, but they are not so intertwined that one cannot be accomplished without the other." Santander Bank, 2016 WL 199408, at *7. The court in Santander Bank observed that "Massachusetts decisions reveal an unmistakable reluctance to let a violation of public policy spoil entirely an otherwise valid agreement." Id. (internal quotation marks omitted). New York case law reveals a similar reluctance to void an agreement entirely under such circumstances. Cf. Averill, 92 N.E. at 209–10. The

Court concludes as a matter of law that the disclosure and access provisions on which SPS bases its public policy argument are severable and would not warrant voiding the Factoring Agreement.

Moreover, as the court in <u>Santander Bank</u> recognized, "the very existence of [Article] 9 of the … Uniform Commercial Code evidences a public policy in favor of" factoring agreements such as the one at issue here. <u>See id.</u> Allowing one nonessential aspect of the Factoring Agreement to defeat the entire relationship under these circumstances would offend the competing public policy in favor of providing law firms access to alternative sources of capital.

### 3.      SPS's Second, Third, Fourth, and Fifth Affirmative Defenses

With respect to SPS's Second, Third, Fourth, and Fifth Affirmative Defenses (all of which are based on Durham's purported domination and control over CGAW, <u>see</u> Answer at 5–6), Durham contends there is no evidence that it exercised any control over Ablitt, the person responsible for directing SPS to transmit wire payments to CGAW. Durham's Motion at 24–26. Durham cites evidence that it never notified SPS that Ablitt had any authority to speak on behalf of Durham. <u>See</u> Crowley Depo. at 58–60. Durham also cites evidence that no one from Durham ever released SPS from the Notice of Assignment. <u>Id.</u> SPS does not directly challenge Durham's argument that Durham did not exercise control over Ablitt, and, indeed, SPS appears to concede the point, arguing instead that Durham's contention that Ablitt was a "rogue actor" is "irrelevant." SPS's Response at 19.

Durham is entitled to summary judgment in its favor with respect to SPS's Second and Third Affirmative Defenses. Those defenses are based on the theory that, due to Durham's control over CGAW, any instruction from CGAW to cease payment to Durham

amounted to an instruction from Durham itself. See Answer at 5–6. Because SPS does not dispute that Ablitt was the only person who instructed SPS to redirect payments, see SPS's Response at 2 ("SPS is in agreement with the undisputed facts set forth in Durham's Renewed Motion."); Durham's Motion at 13–14 (discussing Ablitt's "secret" instructions), the defenses essentially rest on the contention that Ablitt was acting as Durham's agent by virtue of Durham's pervasive control over CGAW. An agency relationship vesting a person with actual authority to act on a principal's behalf requires (1) the principal's acknowledgement that the agent will act for it; (2) the agent's acceptance of the undertaking; and (3) the principal's control of the agent's actions. Whetstone Candy Co. v. Kraft Foods, Inc., 351 F.3d 1067, 1077 (11th Cir. 2003).[29] Moreover, apparent authority exists only "when the principal creates the appearance of an agency relationship." Id. at 1078.

Durham has presented evidence that it was unaware of Ablitt's instruction. See McGrain Decl. at 5, 13. It has also presented evidence that it never notified SPS that Ablitt had authority to act on Durham's behalf. See id. at 5; Crowley Depo. at 58–60. SPS has presented no evidence to demonstrate that a genuine dispute exists as to the whether Durham exercised control over Ablitt or whether Ablitt had even apparent authority to act

---

[29] Durham argues that it makes no difference which state's agency law applies to SPS's agency-related defenses because agency law is essentially the same in all states with some possible connection to this defense—Florida, Massachusetts, and New York. See Durham's Choice of Law Memo. at 16–18. SPS does not address which law should apply to these defenses. See generally SPS's Choice of Law Memo. The Court agrees with Durham that its analysis would be the same whether applying Florida law, Massachusetts law, or New York law. As such, the Court will cite Florida agency law with the understanding that its result would be identical under either Massachusetts law or New York law. Cf. Fioretti v. Mass. Gen. Life Ins. Co., 53 F.3d 1228, 1234 & n.21 (11th Cir. 1995) (stating that, where it is "plainly clear that there is no difference in the substantive law of the competing states," a court arguably may either apply the law of all relevant states or simply apply the law of the forum state since either approach will produce the correct result). To the extent the Court would need to determine whether any alleged agency relationship would give rise to the defenses SPS asserts, New York law would apply.

on Durham's behalf. As such, Durham is entitled to summary judgment in its favor as to SPS's Second and Third affirmative defenses.

SPS's Fourth and Fifth Affirmative Defenses, although also referencing Durham's purported domination and control over CGAW, are not based on the contention that Ablitt's instruction to SPS was effectively an instruction from Durham. Instead, SPS's Fourth Affirmative Defense asserts that Durham's control over the firm provided it with knowledge of the misdirected payments, so Durham should be estopped from recovering because it failed to correct the payments. Answer at 6. Its Fifth Affirmative Defense asserts that Durham's control over the firm allowed it to recover misdirected payments and that it therefore should not be allowed a double recovery. Id.

As previously discussed, Durham has presented evidence that it was unaware of Ablitt's instruction or the fact of the misdirected payments. See McGrain Decl. at 5, 13. While acknowledging that it was aware of SPS's February 2014 payment to CGAW, Durham asserts that Feige, CGAW's CFO, told McGrain that the payment was paid in trust and that McGrain had no reason to question that explanation. Durham's Motion at 38–39. SPS argues that Durham's discovery of SPS's payment to CGAW in February 2014 establishes its knowledge that Ablitt had instructed SPS to misdirect payments and that SPS was complying. SPS's Response at 19–20. It argues that Durham's knowledge of that payment and failure to do anything to stop SPS from continuing to pay CGAW precludes it from now arguing that it is entitled to payment. Id. It also rejects Durham's contention it believed the February 2014 payment was outside the scope of the Factoring

Agreement, arguing that that "explanation runs contrary to McGrain's understanding that every dollar paid to the firm by SPS belonged to Durham."[30] Id. at 19.

Durham is entitled to summary judgment with respect to SPS's Fourth Affirmative Defense. To counter Durham's evidence that it was unaware of SPS's misdirected payments, SPS relies solely on the February 2014 payment, about which Durham undisputedly knew. However, contrary to SPS's assertion, McGrain did not testify that "every single dollar paid to the firm by SPS belonged to Durham." Instead, he testified unequivocally that client trust funds were not within the scope of the Factoring Agreement. McGrain Depo. at 42 ("Durham does not have an interest in trust funds. … [T]hose are not funds which belong to the law firm. They're, by definition, other people's money.").[31] Moreover, no reasonable construction of the Factoring Agreement would include client funds held in trust within the definition of "Account." Such funds indisputably would not

---

[30] SPS also states that its "domination and control defenses also are relevant[,] as Durham's domination provided it with the knowledge of the payments and the ability to correct the problem." SPS's Response at 19. However, SPS points to no evidence that Durham learned of any misdirected payments by virtue of its alleged domination of the firm.

[31] SPS relies on the following exchange to support its position:

Q.      … We've already covered, in your testimony, that whether or not a payment went into an operating account or an escrow account was not dispositive of whether it was covered by the factoring agreement. We've already covered that whether or not an invoice was associated with a payment was not dispositive of whether or not it was covered by the factoring agreement. You just testified that whether or not something was a payment … on an account was not dispositive of whether or not it was covered by the factoring agreement. So … what was the defining characteristic of which monies were subject to Durham's factoring agreement?

…

A.      Any funds being paid to the law firm by SPS. I believe that the notice is relatively clear.

McGrain Depo. at 53–54. However, reading that exchange in context, it is apparent that McGrain viewed client trust funds as not "being paid to the law firm" but rather being held in trust for clients. Indeed, he reiterated that view in later testimony. See id. at 62–63 ("Mr. Feige said that he had spoken to Mr. Ablitt and clarified that they were trust funds. They were funds that did not belong to SPS or the law firm."). McGrain's more general testimony does not contradict his explicit testimony that funds CGAW held in trust for clients were not within the scope of the Factoring Agreement.

involve an "obligation[ ] for the payment of money arising out of … the performance by [CGAW] of services." See Factoring Agreement at 1. Having concluded that Durham's knowledge of the February 2014 payment did not put it on notice that SPS was misdirecting payments on accounts to CGAW, and in the absence of any other evidence supporting a conclusion that Durham knew about Ablitt's instruction, there is no genuine dispute as to that issue.

SPS's Fifth Affirmative Defense is based on the contention that Durham's control over CGAW allowed it to recover misdirected payments from CGAW. As an initial matter, SPS has pointed to no evidence that Durham in fact did recover any such payments from CGAW. In any event, Durham is entitled to summary judgment as to this defense because the Court concludes that the proper measure of damages in this case is the amount SPS improperly paid to someone other than Durham, not the actual damages Durham suffered.

The Court finds the analysis in Reading Co-Op. Bank v. Suffolk Construction Co., 984 N.E.2d 776 (Mass. 2013), persuasive. In that case, the court concluded that "the proper measure of [an] assignee's recovery under [§ 9-406] is the total value of all payments wrongfully misdirected." Id. at 784. In reaching that conclusion, the court found that UCC Article 9 displaced the common-law measure of damages because it "provide[d] a comprehensive scheme designed to put the aggrieved party in as good a position as if the other party had fully performed." Id. at 782 (internal quotation marks and alterations omitted). Specifically, it noted that § 9-406(a) requires an account debtor that has received a notice of assignment to pay the assignee in order to discharge its contractual obligation to the assignor. Id. The court also observed that Article 9 "provides a detailed

-45-

framework for the distribution of funds recovered by an assignee from an account debtor" under which "the assignee is entitled to retain only such funds as are necessary to recover reasonable costs of collection and enforcement and to satisfy the obligations of the assignor for which collection was secured." Id. at 782–83. The court also found that measuring damages based on the total amount wrongfully paid "accords with the stated purposes of the UCC," including "to simplify, clarify[,] and modernize the law governing commercial transactions." Id. at 783 (internal quotation marks omitted). Although recognizing the "harsh result" such an interpretation would cause, the court concluded that such a result was appropriate because an account debtor could mitigate its loss by "establish[ing] itself as a subordinate creditor in line for disbursement of excess funds." Id. at 784–85.

Notably, SPS presents no argument or authority on the proper measure of damages in this case. See generally SPS's Response. The Court therefore concludes that SPS does not dispute the analysis in Reading.[32] Having found no authority to the contrary, the Court follows Reading and concludes that the proper measure of damages in this case is the total amount SPS wrongfully paid to someone other than Durham. Therefore, whether Durham was able to recover any payments from CGAW is irrelevant.

### 4.    SPS's Sixth Affirmative Defense

As its Sixth Affirmative Defense, SPS asserts that it was entitled to make some payments to CGAW while the Allonge to the Factoring Agreement was in effect. See

---

[32] SPS did state in a motion to compel it filed more than a year earlier that it "disputes that the Reading opinion, which is relied upon heavily by Durham as a purported basis to undermine SPS's defenses and rights or recoupment[,] has any applicability to the case at bar." See Doc. 36 at 5. However, SPS did not elaborate and has not mentioned any disagreement with Reading in any of its briefing on summary judgment.

Answer at 7. In response, Durham contends that SPS had no right under the Allonge to direct payments to CGAW because the Allonge never took effect; even if it did, it did not release SPS from the obligation to pay Durham until CGAW paid Durham $3.2 million under the Factoring Agreement (which it did not do); and SPS could not have relied on the Allonge because SPS was unaware of the Allonge's existence at the time it made the payments. Durham's Motion at 30–32. Notably, the Court has already concluded that, even viewing the evidence in the light most favorable to Durham, there is no genuine dispute that the Allonge was in effect for at least some period of time and that it permitted CGAW to retain payments on certain new invoices. See supra at 33-34. The Court also concluded that there is a genuine dispute as to the time frame during which CGAW had the right to retain such payments. Id. at 35. As such, Durham is not entitled to summary judgment as to SPS's Sixth Affirmative Defense.

### 5. SPS's Seventh, Eighth, Ninth, Eleventh, and Twelfth Affirmative Defenses

SPS's Seventh, Eighth, Ninth, Eleventh, and Twelfth Affirmative Defenses all stem from the Attorney Agreement, whether based on CGAW's alleged breach of the agreement, its alleged fraudulent inducement of SPS to enter into the agreement, or its obligation to indemnify SPS. Durham argues SPS cannot offset amounts it otherwise owes to Durham under the Factoring Agreement because it waived any setoff defenses based on breach of the Attorney Agreement or its invalidity by paying CGAW on all of the invoices at issue without challenging its obligation to do so.[33] Durham's Motion at 26–28.

---

[33] The parties agree, and the Court concludes, that New York law applies to the determination of whether SPS waived any defense of setoff or recoupment by paying CGAW. Durham's Choice of Law Memo. at 7, 19; see SPS's Choice of Law Memo. at 7.

It also contends that SPS is barred under UCC section 9-404(a)(2)[34] from asserting any of the claimed setoffs because they all arose after SPS had received the Notice of Assignment. Id. at 28–29.

Durham is not entitled to summary judgment with respect to SPS's setoff and recoupment claims arising from the Attorney Agreement.[35] First, the Court cannot conclude as a matter of law that SPS waived its right to assert defenses to payment under the Attorney Agreement. "To establish a waiver, a [party] must demonstrate that the [opposing party] voluntarily and intentionally relinquished a known right with both knowledge of its existence and an intention to relinquish it." Bailey v. Peerstate Equity Fund, L.P., 7 N.Y.S.3d 142, 145 (N.Y. App. Div. 2015). A genuine dispute exists as to whether SPS knew of the alleged breaches of the Attorney Agreement or misrepresentations when it paid CGAW. SPS has presented evidence that it was never informed that CGAW had given Durham access to CGAW's client files and internal

---

[34] Durham cites Florida Statutes section 679.4041(1)(b). See Durham's Motion at 28. As previously discussed, the parties agree, and the Court has concluded, that New York's codification of the UCC applies to the UCC-related issues in this case. In any event, aside from the numbering of subsections, the Florida statute Durham cites is identical to New York's statute.

[35] Although Durham moves for summary judgment on all of SPS's Affirmative Defenses arising from the Attorney Agreement, it devotes most of its argument to the issue of whether SPS waived any setoff defense by paying CGAW. That argument has no bearing on SPS's Ninth Affirmative Defense, which asserts that CGAW must indemnify SPS. However, Durham did address that defense in a footnote in its Motion. See Durham's Motion at 26 n.6. It contends that that defense fails because (1) the defense is "legally insufficient against Durham," and (2) the defense indisputably does not apply because the Attorney Agreement's indemnification provision does not apply to the extent that the act giving rise to the claim for indemnification "arose out of … or in connection with the negligence or wrongful conduct of SPS." Id. (citing Attorney Agreement at 15.

Durham fails to sufficiently develop its arguments with respect to SPS's Ninth Affirmative Defense. It cites no authority for the proposition that SPS cannot assert its right to indemnification by CGAW as a defense against Durham, and it does not offer any evidence or authority establishing as a matter of law that SPS's failure to pay Durham amounted to "negligence or wrongful conduct." Notably, Durham's argument fails to account for the fact that Ablitt told SPS to misdirect the payments and the possible effect that fact could have on the alleged wrongfulness of SPS's conduct. The Court therefore declines to grant summary judgment in Durham's favor as to SPS's Ninth Affirmative Defense.

systems. Affidavit of Peter Justin Crowley dated April 15, 2015 (Doc. 30-1; "Crowley Aff.") at 4. It has also presented evidence that it was never informed that CGAW had used millions of dollars in client trust funds to cover operating costs. Id. Without knowledge that CGAW had purportedly breached the Attorney Agreement or misrepresented its financial condition, SPS could not have known that it had a right to withhold payment to or seek damages from CGAW. In light of that factual dispute, the Court cannot conclude as a matter of law that SPS "voluntarily and intentionally relinquished" any right to withhold payment or seek damages from CGAW based on CGAW's alleged breaches of the Attorney Agreement or other wrongful conduct.

Durham cites a handful of cases which it contends support the proposition that an account debtor who wrongfully pays accounts to someone other than the assignee after it receives a notice of assignment "waives the right under UCC Art. 9-404 to assert any setoff to reduce amounts owing to the assignee." Durham's Motion at 27. However, those cases are inapposite. First, National Trade Trust, Inc. v. Merrimac Construction, 524 N.W.2d 14 (Minn. Ct. App. 1994), involved a knowing waiver of a setoff claim. The court first acknowledged that ordinarily an account debtor may assert a valid setoff to avoid payment to an assignee. See id. at 16 ("Absent a valid setoff, Merrimac was obligated, as a matter of law, to pay National."). The court then concluded that the account debtor could not claim a setoff under the circumstances because it chose to pay the assignor instead of asserting a defense to payment at that time. See id. at 17 ("Put another way, when Merrimac received a bill from Heart Drywall for the $19,418, it had a perfect right to delay payment to Heart Drywall or any assignee of Drywall and claim that the work was defective or claim any other defense on the merits it might have to the bill. That defense

against Heart Drywall's claim would also be good against assignees, such as National, unless and until Merrimac paid Heart Drywall the $19,418 voluntarily or pursuant to court order."). Merrimac does not support the proposition that an account debtor waives all setoff claims, whether known or unknown, when it makes a payment to anyone.

Durham also cites Rockland Credit Finance v. Fenestration Architectural Products, No. 06-3065, 2008 WL 1773234 (R.I. Sup. Ct. Mar. 12, 2008). Durham's Motion at 27. Citing Merrimac, the court in Rockland concluded that § 9-404 no longer applied at all once the account debtor paid the wrong party. Id. The Court finds Rockland unpersuasive. The Court simply does not read section 9-404 so narrowly. It states broadly that "the rights of an assignee are subject to … all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract." N.Y. U.C.C. § 9-404(a)(1). Nothing in the language of that provision precludes it from applying even after an account debtor has made a wrongful payment. Indeed, under general principles of contract law, when one party materially breaches a contract, the non-breaching party may elect to continue the contract and seek damages later. See Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1011 (S.D.N.Y. 1995).

Durham also cites Reading. See Durham's Motion at 27. Although the court in Reading cited Merrimac, it did not address the availability of setoffs after an account debtor has made a wrongful payment. See Reading, 984 N.E.2d at 784–85. Instead, it apparently cited Merrimac to support (1) its conclusion that the proper measure of damages was the amount the account debtor wrongfully paid and (2) its observation that the account debtor must run the risk that the wrongfully paid party is insolvent. See id.

Finally, Durham cites <u>United States v. Hoffman Construction Co. of Oregon</u>, No. CIV. 98-1498-KI, 1999 WL 805144 (D. Or. Sept. 28, 1999). However, <u>Hoffman</u>, like <u>Merrimac</u>, also involved a knowing waiver of the account debtor's setoff defenses. In concluding that the account debtor was obligated to pay the assignee, the court observed that "[i]f [the account debtor] was not sure of the amount owed to [the assignor], it could have withheld payment until the matter was resolved or paid laborers directly if need be. When [the account debtor] chose to make payments …, it needed to honor the assignment of which it had notice." <u>Id.</u> at *5. Here, unlike <u>Hoffman</u>, to the extent SPS was unaware of CGAW's alleged material breaches of the Attorney Agreement, it would have had no reason to be unsure of the amount it owed, nor would it have had any known right under the contract to withhold payment. Having failed to establish as a matter of law that SPS is precluded from raising setoffs based on newly discovered breaches of the underlying contract, Durham is not entitled to summary judgment on that basis.

Durham's other argument with respect to SPS's setoff and recoupment defenses is unavailing. It contends SPS cannot assert any of the claimed setoffs because they all arose after SPS received the Notice of Assignment.[36] However, courts addressing the distinction between subsections (a)(1) and (a)(2) of UCC section 9-404 have concluded that subsection (a)(1) applies to defenses or claims arising from the contract giving rise to the assigned right to payment—which the account debtor may assert regardless of

---

[36] SPS misconstrues Durham's argument on this point. It seems to assume that Durham argues SPS's setoffs are time-barred by some statute of limitations. <u>See</u> SPS's Response at 16. Although the Court understands why SPS might have made that assumption based on the wording in Durham's Motion ("Each and every purported set off defense raised by SPS arose more than one year after SPS consented to Durham's Notice of Assignment, and is barred by Fla. Stat. § 679.4041(1)(b)," <u>see</u> Durham's Motion at 28), the Court believes Durham actually contends the setoffs are barred because the UCC provision it cites allows an account debtor to assert certain defenses only if they accrued before the account debtor received notice of the assignment. <u>See</u> N.Y. U.C.C. § 9-404(a)(2).

when they arose—whereas subsection (a)(2) applies to defenses or claims unrelated to the contract underlying the right of payment. See First Nat'l Bank of Boston v. Thomson Consumer Elecs., Inc., 84 F.3d 397, 401 (11th Cir. 1996); Merrimac, 524 N.W.2d at 16; First New England Fin. Corp. v. Woffard, 421 So. 2d 590, 595 (Fla. 5th DCA 1982); Ertel v. Radio Corp. of Am., 307 N.E.2d 471, 476 (Ind. 1974). That interpretation aligns with Official Comment 2 to section 9-404. See N.Y. U.C.C. § 9-404, Official Cmt. 2 ("Under subsection (a)(1), if the account debtor's defenses on an assigned claim arise from the transaction that gave rise to the contract with the assignor, it makes no difference whether the defense or claim accrues before or after the account debtor is notified of the assignment. Under subsection (a)(2), the assignee takes subject to other defenses or claims only if they accrue before the account debtor has been notified of the assignment."). Durham cannot reasonably dispute that the setoffs SPS claims arise from the Attorney Agreement, which created the accounts receivable CGAW assigned to Durham. As such, it makes no difference that the bases for SPS's claimed setoffs arose after SPS received notice of the assignment.

### 6.    SPS's Tenth Affirmative Defense

In its Tenth Affirmative Defense, SPS asserts that it is not obligated to pay Durham to the extent its payments were for services performed by firms other than CGAW.[37] See Answer at 9. In deposition, Crowley explained that this defense was based on "the

---

[37] Durham asserts that this Affirmative Defense is governed by New York law because it "essentially goes to the issue of setoff and the definition of 'accounts.'" Durham's Choice of Law Memo. at 7, 19. SPS does not specifically address the law applicable to this defense but does assert more generally that New York law applies to all defenses requiring interpretation of the Factoring Agreement. See SPS's Choice of Law Memo. at 4–5. To the extent that evaluation of this defense requires a determination of the scope of the Factoring Agreement, including whether accounts arising from work performed for SPS in Puerto Rico were part of CGAW's assignment of accounts to Durham, New York law governs.

concept that was introduced by the principals of the firm that the Puerto Rico law firm was a separate entity." Crowley Depo. at 159–60. In Durham's Motion, Durham argues that there is no evidence that any of SPS's payments were for services performed by law firms other than CGAW and that Crowley acknowledged that "all payments on all Accounts were made payable to CGAW." Durham's Motion at 38. It also contends that the Attorney Agreement "expressly referenced work performed by CGAW in Puerto Rico, and there was no separate contract between SPS and a Puerto Rico entity." Id. SPS does not respond to Durham's argument on this defense. See generally SPS's Response.

Durham is entitled to summary judgment with respect to SPS's Tenth Affirmative Defense. Although Crowley testified that Ablitt had suggested that the office in Puerto Rico was "a separate and distinct entity," see Crowley Depo. at 77, he nevertheless testified that all payments SPS made for work performed in Puerto Rico were made payable to CGAW, see id. at 76, 78, 161–62.[38] Moreover, the Attorney Agreement itself

---

[38] Crowley testified as follows:

> Q.   … [R]egardless of what you were told by the lawyer, were the payments made to Connolly Geaney Law Firm to this separate account?
>
> A.   That's my understanding, yes.
>
> …
>
> Q   [R]egardless of what account was being paid, regardless as to what location the account was, the payments that were being generated by SPS in accordance with SPS's internal accounts payable department was being paid to Connolly Geaney?
>
> A.   Yes.
>
> …
>
> Q.   Whatever payments were made to the Puerto Rican location, those payments would have been totaled and would have been identified in tax reporting forms that would have been transmitted to the Internal Revenue Service as payments having been made to the Connolly Geaney Law Firm? Is that correct?
>
> A.   That's correct.

Crowley Depo. at 76, 78. He later testified as follows:

> Q.   But as you sit here today you don't know of any separate and distinct Puerto Rico firm?

refs to CGAW's provision of "various legal services … in Florida, Massachusetts, New Hampshire, and Puerto Rico." <u>See</u> Attorney Agreement at 1. Additionally, the Allonge to the Attorney Agreement added additional statements of work relating to Puerto Rico. <u>See</u> Allonge to Attorney Agreement (Doc. 76-1) at 1 (unredacted version filed under seal). One statement of work provided for SPS's referral of litigation matters in Puerto Rico to "the FIRM," where "the FIRM" was defined as CGAW, <u>id.</u> at 4 (unredacted version filed under seal); another statement of work applied to "support/oversight staff for the FIRM's [again, defined as CGAW] office located in the Commonwealth of Puerto Rico," <u>id.</u> at 7 (unredacted version filed under seal). Crowley testified that he had never received any request from CGAW's shareholders to "sign an engagement letter or an attorney agreement with another law firm for services in Puerto Rico." Crowley Depo. at 80. As such, there is ample evidence that all of SPS's payments, including for work in Puerto Rico, were made to CGAW for work performed by CGAW and so were within the scope of the Factoring Agreement. Because SPS has failed to present any evidence or argument to the contrary, the Court concludes that no genuine dispute exists on this issue.[39]

---

A.   I don't know whether there would be an actual ruling that that is a separate and distinct entity. I know they were separate operations, and it was communicated by the principals of the firm that it was separate and distinct.

Q.   But, if they were—if it was communicated to you that the services were separate and distinct, then why would you continue to pay for Puerto Rico borrower services under the name Connolly Geaney, which is what I think you testified to earlier?

A.   That's a good question.

Crowley Depo. at 161–62.

[39] This conclusion is not inconsistent with the Court's prior determination that a genuine dispute exists as to Durham's <u>prima facie</u> case. Durham must still prove that any invoices for work performed for SPS in Puerto Rico were assigned to Durham. The Court simply concludes that, if Durham makes that showing, SPS's Tenth Affirmative Defense would fail because the fact that some technically distinct entity in Puerto Rico performed the services underlying the invoice would not change the fact that CGAW assigned the invoice to Durham.

### 7.      SPS's Thirteenth Affirmative Defense

In its Thirteenth Affirmative Defense, SPS asserts that Durham failed to mitigate its damages "by, among other things, failing to take action to prevent additional payments from being made to [CGAW] at a time when Durham was aware of such payments and/or [CGAW's] requests to SPS that payments be made directly to CGAW."[40] Answer at 10. As such, this defense is based on essentially the same contention underlying SPS's Fourth Affirmative Defense (asserting estoppel based on Durham's knowledge of SPS's misdirected payments). Because the Court has concluded that there is no genuine dispute as to whether Durham knew of Ablitt's instruction to SPS or SPS's alleged misdirection of payments to CGAW, see supra at 42-43, Durham is entitled to summary judgment as to this defense as well. Moreover, as previously discussed, see supra at 45-46, the proper measure of damages in this case is the total amount SPS wrongfully paid to someone other than Durham. Thus, Durham's alleged failure to mitigate its damages is irrelevant. See Reading, 984 N.E.2d at 785–86 (concluding that "the common-law doctrine of mitigation of damages does not apply to claims brought under" section 9-406).

### 8.      SPS's Fifteenth Affirmative Defense

In its Fifteenth Affirmative Defense, SPS asserts that "Durham's claims are bar[r]ed by the doctrines of laches and unclean hands."[41] Answer at 11. Laches "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has

---

[40] The parties agree, and the Court concludes, that New York law applies to the issue of whether Durham had a duty under the UCC to mitigate its damages and, if so, whether it failed to do so. Durham's Choice of Law Memo. at 7, 19; see SPS's Choice of Law Memo. at 5–6.

[41] Durham asserts that New York law applies to SPS's defenses of laches and unclean hands. Durham's Choice of Law Memo. at 7, 19–20. SPS does not address which law would apply to those defenses. See generally SPS's Choice of Law Memo. Because the defenses go to whether Durham has forfeited its right to receive payment pursuant to the Factoring Agreement through allegedly inequitable conduct, the Court concludes that New York law applies to those defenses.

resulted in prejudice to the defendant." <u>Ivani Contracting Corp. v City of N.Y.</u>, 103 F.3d 257, 259 (2d Cir. 1997). Under the doctrine of unclean hands, a litigant who is guilty of inequitable conduct is precluded from recovering equitable relief. <u>See</u> <u>Levy v. Braverman</u>, 260 N.Y.S.2d 681, 683 (N.Y. App. Div. 1965).[42] Durham argues that those defenses fail because it was unaware of Ablitt's instruction to SPS to misdirect payments to CGAW. Durham's Motion at 38–39. As previously discussed in addressing SPS's defenses of estoppel and failure to mitigate damages, there is no genuine dispute as to whether Durham knew of Ablitt's instruction to SPS or SPS's misdirected payments to CGAW. <u>See</u> <u>supra</u> at 43-45. As such, Durham is entitled to summary judgment with respect to SPS's Fifteenth Affirmative Defense.

## V.    Conclusion

In light of the foregoing, SPS's Motion is due to be granted in part and denied in part, and Durham's Motion is due to be granted in part and denied in part. Accordingly, it is hereby

**ORDERED:**

1.    Defendant Select Portfolio Servicing, Inc.'s Motion for Final Summary Judgment (Doc. 58) is **GRANTED in part and DENIED in part.**

   a.    SPS's Motion is **GRANTED** to the extent that the Court concludes that the Allonge to the Factoring Agreement was in effect for some

---

[42] It is questionable whether the equitable defenses of laches and unclean hands would apply to Durham's claim. <u>See</u> <u>Manshion Joho Ctr Co., Ltd. v. Manshion Joho Ctr., Inc.</u>, 806 N.Y.S.2d 480, 482 (N.Y. App. Div. 2005) ("The doctrine of unclean hands is an equitable defense that is unavailable in an action exclusively for damages."); <u>Cognetta v. Valencia Developers, Inc.</u>, 778 N.Y.S.2d 80, 81 (N.Y. App. Div. 2004) ("[B]ecause Dana's cause of action for repayment constituted an action at law, the equitable defense of laches was unavailable to the defendants with respect to this cause of action."). Regardless, the Court need not decide the applicability of those defenses because the basis of these defenses is the same basis the Court has rejected with respect to SPS's defenses of estoppel and mitigation of damages.

period of time in March 2014 and allowed SPS to pay some amount directly to CGAW.

    b.    The motion is otherwise **DENIED.**

2.    Plaintiff, Durham Commercial Capital Corp.'s Motion (Renewed) for Final Summary Judgment Against Defendant Select Portfolio Servicing, Inc. and Incorporated Memorandum of Law (Doc. 64) is **GRANTED in part and DENIED in part**.

    a.    Durham's Motion is **GRANTED** to the extent that it is entitled to judgment in its favor with respect to SPS's First, Second, Third, Fourth, Fifth, Tenth, Thirteenth, and Fifteenth Affirmative Defenses.

    b.    The motion is otherwise **DENIED.** SPS's Sixth, Seventh, Eighth, Ninth, Eleventh, Twelfth, and Fourteenth Affirmative Defenses, and its newly raised affirmative defense asserting that its payments for litigation costs were outside the scope of the Factoring Agreement, remain in the case.

3.    The Court will defer entry of judgment as described above pending resolution of all remaining issues.

4.    Plaintiff Durham Commercial Capital Corp.'s Motion to Strike Defendant Select Portfolio Servicing, Inc.'s Notice of Supplemental Authority [D.E. 111] (Doc. 112) is **GRANTED**.

5.    Defendant's Notice of Supplemental Authority (Doc. 111) is **STRICKEN**.

6.      Plaintiff Durham Commercial Capital Corp.'s Motion for Leave to File a Reply to Defendant Select Portfolio Servicing, Inc.'s Response to Plaintiff's Motion to Strike Notice of Supplemental Authority (Doc. 114) is **DENIED**.

7.      Plaintiff Durham Commercial Capital Corp.'s Motion for Status Conference (Doc. 115) is **DENIED AS MOOT**.

8.      A separate order setting this case for a final pretrial conference and trial shall enter.

**DONE AND ORDERED** in Jacksonville, Florida, on October 17, 2016.

MARCIA MORALES HOWARD
United States District Judge

lc21
Copies to counsel of record